68 U.S. 684
 17 L.Ed. 675
 1 Wall. 684
 PARKER
v.
PHETTEPLACE ET AL.
 December Term, 1863
 
 APPEAL from the Circuit Court for the District of Rhode Island.
 The complainants below, appellants here, filed a bill as judgment creditors, to set aside conveyances of the property of one Edward Seagrave, their debtor, and made, as they alleged, to hinder and delay the execution of their judgment. The judgment was recovered in the Circuit Court of the United States, at November Term, 1854, against the said Seagrave, for $60,520.88, and costs, in a suit commenced on the 26th October previous. Execution was duly issued and part of the debt collected, the remainder still remaining due and unpaid. The conveyances charged to be fraudulent were executed by the judgment debtor on the 17th November, 1854, and the 4th January, 1855; the first to Phetteplace & Seagrave, a firm in Providence, Rhode Island, of certain real estate and stocks; the second, an assignment to one Updike, of all his real and personal property, in trust for the benefit of creditors; giving certain preferences specified in the assignment. The Seagrave of the firm of Phetteplace & Seagrave, was George Seagrave, a brother of Edward, the debtor. Both were residents of the same place, Providence.
 It appeared from the proofs, that in the early part of 1853, Edward Seagrave, the ebtor, Merrit & Co., and S. Harris, associated together to speculate in the purchase and sale of wool, the purchases to be made upon the credit of the paper of the parties, to be discounted at the banks. In this way, Seagrave's liabilities from acceptances and indorsements amounted, in July, 1853, to about $176,000. Becoming alarmed at the magnitude of this debt, he made an arrangement with his associates, by which he sold out his interest in the business to them; and in consideration that they would pay all the outstanding paper, and would indemnify him against the same, he agreed to pay them $33,500. This sum was paid and the indemnity given. These associates failed to take up the paper, and on the 4th February, 1854, went into insolvency. Seagrave stopped payment on this partnership paper the same day, but continued his individual business until the 4th January, 1855, when he made the assignment to Updike for the benefit of his creditors. In the autumn of 1854, Phetteplace & Seagrave, the defendants below and appellees here, a firm in Providence, as already stated, finding the outstanding paper of the associates in the wool speculation, held by the banks, at a great discount, purchased of that paper to the amount of some $45,000, at the rate of from fifteen to twenty cents on the dollar, and afterwards applied to Edward Seagrave, the judgment debtor, one of the parties to the paper, for payment or security. The stocks and real estate conveyed for the security and payment of this indebtedness, together with the property assigned to Updike for the benefit of creditors, constitute the subject of complaint in the bill.
 The bill charged that this outstanding paper against Edward Seagrave was purchased under an arrangement or understanding that he should have the benefit of the difference between the nominal value and the per cent. paid; that this proportion of the stocks and real estate transferred to the purchasers to secure the payment belong to him, and is held in trust for his benefit; and that the scheme was contrived for the purpose of hindering and defeating their execution; and further, that the assignment to Updike was a part of the same fraudulent device.
 The answer denied positively the allegations of the bill, and Edward Seagrave, who being now resident out of Rhode Island, was not made a defendant in the case, and was called by Phetteplace & Seagrave as a witness, testified in like positive manner that there was no understanding between him and Phetteplace & Seagrave, such as was alleged; that he had no interest in the paper, and that he had never received any profit from it.
 The court below, after a full hearing of the case, dismissed the bill; which was the matter complained of here.
 Mr. Jenks, for the creditor, plaintiff in error—admitting that by the law of Rhode Island an insolvent debtor might make preferences, if fair ones—relied largely on the special facts of this case, which he brought together from every part of the testimony, and presented in a strong and highly colored aspect. It was not to be expected that proof could be brought of a covenant in writing to commit this fraud, nor even proof of words. The parties here were intelligent men; far too intelligent for that. That would be gross and vulgar fraud. But the deed, not the less, was done. The greatest crimes which power ever has commanded have been done without a word.[1]
 An understanding—'signs' parleying again with 'signs'—is all that is necessary to allege. The relations of the parties speak trumpet-tongued.
 George Seagrave was Edward's brother; both lived in the town of Providence; both had the means of knowledge, and actually knew the amount of property held by Edward, and that a conveyance to them by Edward, of the property described in the present suit, would deprive him of all means of paying his other creditors. This knowledge, Mr. Jenks contended with force, threw upon them the burden of proving the fairness of the transaction. That they had not done; and it is admitted that they purchased depreciated paper, which Edward Seagrave had neither paid, nor expressed the least intention of paying, and then claimed payment in full, knowing that such payment would deprive the debtor of all means of paying anything to his other creditors. They were not ordinary or just creditors. They came to be creditors at all but as purchasers of discredited paper. The simple idea of the thing the idea of one brother going into the street, to purchase for almost nothing the notes of his dishonored brother, whom, in the purchase, it was his interest of course to dishonor further; and then, with his business accomplished, coming back with the notes in his hand to obtain payment of them in full,—was disgusting; and would, of itself, fill every honorable mind with suspicion and disesteem. Did he buy the notes, meaning to put into operation against a brother the sharp and cruedl means of adverse process of the law to collect them? Certainly not. He knew they would be paid without this. Such was the understanding, and herein was the fraud.
 The assignment of Updike was void, and was part of the scheme to cover up the fraud by which the property of Edward Seagrave was placed in the hands of his own brother and Phetteplace. Such assignments are no obstruction to the execution of legal process, or to the granting of relief in equity.[2]
 Mr. Potter, contra, contending that the purchase of the notes of an insolvent merchant was a practice perfectly known and legal, denied the existence of fraud, and relied largely, among other testimony, on the effect of the positive denials in the answer, which not only were uncontradicted by two witnesses, or by one witness and circumstances, but were fully supported by Edward Seagrave, the person best competent to declare his purposes and property.
 Mr. Justice NELSON delivered the opinion of the court.
 
 
 1
 The case turns upon the answer to be given upon the evidence to this charge in the bill, as it is agreed that, according to the law of Rhode Island, the debtor in insolvent circumstances has a right to pr fer creditors in the distribution of his estate, or in the application of it to the payment of his debts.
 
 
 2
 The charge is denied in the answers, and Edward Seagrave, the debtor, not made a party to the bill, who was called as a witness for the defendants, sustains the answers. He testified that there was no agreement or understanding between him and the firm of Phetteplace & Seagrave that he was to share in the profits arising out of the purchase of this paper, nor had he any interest in the same, nor has he ever received any share of the profits, nor do the purchasers hold any portion of them in trust for his benefit. His testimony upon this point, and which constitute the main issue in the case, is full and explicit in the denial of any participation, directly or indirectly, in the transaction. The evidence relied on on the other side to overcome the answers of the defendants, and the testimony of this witness, is circumstantial and argumentative.
 
 
 3
 The court below, on a very full consideration of all the proofs, came to the conclusion that the purchase of the paper by Phetteplace & Seagrave was an independent transaction, without any agreement or understanding with the debtor; that their title to the paper was absolute and unqualified, and that the debtor had no interest in the same, legal or equitable, present or future, and rendered a decree dismissing the bill. We agree that there is ground of suspicion that the purchase was made by the friends and for the benefit of Edward Seagrave, the debtor, but concur with the court that the weight of the proofs is otherwise, and the bill properly dismissed. The question upon the assignment to Updike is so intimately connected with the transaction we have just examined, the conclusion arrived at in the one must control that in the other.
 
 
 4
 The principal point made against this assignment is, that the preference in it in favor of Phetteplace & Seagrave for certain debts and liabilities, embrace the outstanding paper which they had purchased, and which was secured by the previous conveyances. But, on looking into the assignment, this interpretation is not warranted. The preference relates to other indebtedness and liabilities.
 
 
 5
 It is also said that Edward Seagrave embraced in this assignment the purchased outstanding paper which he took up, on giving security to the purchasers. But this was proper, as Merrit & Co., and Harris, who were on the paper, had bound themselves to indemnify Seagrave against it, and were, therefore, still liable upon it; and were to the assigns on the transfer of it to him.
 
 
 6
 DECREE AFFIRMED.
 
 
 7
 Mr. Justice MILLER dissented.
 
 
 
 [1]
 The great poet of our language touches finely on the sentiment which counsel here enforced. And when the murder of a prince was to be accomplished by a royal villain uncle, it was done upon 'the winking of authority.' Every one recalls the two great scenes in King John, before and near the death of Arthur. The king is now addressing his attendant, Hubert. I quote from memory.
 King John. I had a thing to say,—but let it go.
 If that thou couldst see me without eyes,
 Hear me without thine ears, and make reply
 Without a tongue, using conceit alone,——
 Without eyes, ears, and harmful sound of words,——
 I would into thy bosom pour my thoughts:
 But ah! I will not.
 He lies before me. Dost thou understand me?
 Thou art his keeper.
 Hubert. And I will keep him so,
 That he shall not offend your majesty.
 At a later day, when remorse and terror have seized the conscience-stricken king for Arthur's death, he reproaches his attendant, Hubert, with having understood him when only he 'faintly broke' the subject.
 King John. It is the curse of kings to be attended
 By slaves, that take their humors for a warrant
 To break within the bloody house of life;
 And, on the winking of authority,
 To understand a law.
 Hadst thou but shook thy head, or made a pause,
 When I spake darkly what I purposed,
 Or turned an eye of doubt upon my face,
 As bid me tell my tale in express words,
 Deep shame had struck me dumb.
 But thou didst understand me by my signs,
 And didst in signs again parley with sin;
 Yea, without stop didst let thy heart consent,
 And consequently thy rude hand to act
 The deed which both our tougues held vile to name.
 
 
 [2]
 1 American Leading Cases, 17-75; Stewart v. Spenser, 1 Curtis, 157; Heydock v. Stanhope, Id., 471; In the matter of Durfee, 4 Rhode Island, 401.